**Garcia v. HCR ManorCare LLC**

C.P. of Berks County, No. 3-27281

SPRECHER, *J.*, Nov. 10, 2014—Defendants, HCR ManorCare, LLC, ManorCare of Sinking Spring PA, LLC d/b/a/ ManorCare Health Services — Sinking Spring, ManorCare Health Services, Inc. a/k/a ManorCare Health Services, LLC; Manor Care, Inc., HCR ManorCare, Inc.,

HCR IV Healthcare, LLC, HCR III Healthcare, LLC, HCR II Healthcare, LLC, HCR Healthcare, LLC, HCRMC Operations, LLC, HCR ManorCare Operations II, LLC, and Heartland Employment Services, LLC, appeal the order dated September 2, 2014, which overruled in part and sustained in part, their preliminary objections to plaintiff's complaint. This opinion is filed pursuant to Pa. R.A.P. 1925.

## FACTS

The facts gleaned from the record are as follows.

Gloria Marie Eckert (hereinafter, Patient) was a resident of defendant ManorCare of Sinking Spring, Pa, LLC d/b/a ManorCare Health Services — Sinking Spring (ManorCare) from September 19, 2012 to October 2, 2012. The remaining ManorCare defendants own, operate, and/or manage nursing homes, including ManorCare. Patient then became a patient at Kindred Transitional Care & Rehabilitation — Wyomissing (Kindred) from October 11, 2012 through November 7, 2012. The remaining Kindred defendants own, operate, and/or manage nursing homes, including Kindred. Plaintiff filed a medical professional liability action against all the defendants.

At the time of her residence at ManorCare, patient was incapable of independently providing for all of her daily care and personal needs without assistance. She had an 18 cm. surgical incision to her left hip with bruising s/p left femur fracture with ORIF on September 19, 2012. Plaintiff, Gloria J. Garcia, is patient's daughter

and attorney-in-fact. Plaintiff alleges that the ManorCare defendants deprived patient of adequate care, treatment, food, water, and medication, and caused her to suffer numerous illnesses and injuries, including pneumonia, hypoxic hypercapnic respiratory failure, MRSA of the naves, VRE, poor hygiene, and severe pain.

Plaintiff's complaint contains six counts: Count One — negligence against ManorCare defendants; Count Two — negligence *per se* for violations of neglect of a care-dependent Person, 18 Pa. C.S.A. § 2713 against ManorCare; Count Three — negligence *per se* for violations of the Pennsylvania Older Adults Protective Services Act, 35 P.S. § 10225.101 *et seq.* against ManorCare. Count Four is a negligence claim against the Kindred defendants. Count Five is negligence *per se* for violations of neglect of a Care-Dependent Person, 18 Pa. C.S.A. § 2713 against the Kindred defendants, and Count Six is a claim of negligence *per se* for violations of the Pennsylvania Older Adults Protective Services Act, 35 P.S. § 10225.101 *et seq.* against the Kindred defendants.

All defendants filed preliminary objections. This court shall address only ManorCare's preliminary objections in this opinion. First preliminary objection was a motion to enforce the arbitration agreement (agreement) executed by patient's husband, Robert Eckert (hereinafter, Husband), who had a power of attorney for patient on the date of her admission to ManorCare. Second preliminary objection was a motion to strike claims of ordinary negligence. Third preliminary objection was a motion to strike claims

of negligence *per se* pursuant to the neglect of a Care-Dependent Person statute. Fourth preliminary objection was a motion to strike claim for negligence *per se* pursuant to the Older Adults Protective Services Act. Fifth preliminary objection was an objection to scandalous and impertinent matter. Sixth preliminary objection was a motion to strike allegations of unnamed agents and theories of liability based on allegedly tortious conduct of her physicians, acting as agents. Seventh preliminary objection was a motion to strike plaintiff's complaint for her failure to delineate the allegations that are being brought against each defendant. Eighth preliminary objection was a motion to strike allegations of outrageous conduct to justify punitive damages.

In rendering a decision on the enforceability of the agreement, this court reviewed the pleadings, briefs, argument of counsel, the transcript of patient's deposition, the transcript of husband's deposition, and the transcript of defendant's nursing home administrator.

Patient had given husband a durable power of attorney on September 5, 2006. On November 12, 2012, patient rescinded husband's power of attorney and appointed her daughter and plaintiff, Gloria J. Garcia, as her power of attorney because patient believed that plaintiff was more stable and knowledgeable than husband who was getting older and forgetful (patient, 34). Patient was in pain on the day of her admission to ManorCare, so husband signed the admission paperwork. Husband never showed her a copy of the documents which he had signed. Although husband

had a power of attorney for patient, patient signed papers whenever she had been able to do so.

Husband testified that he was born on December 10, 1927. He thought that his street address was 1488 Gregory Avenue, but it is actually 1440 Gregory Avenue (husband, 9). On the date of the deposition, patient and husband had lived at this address for approximately three years. Husband did not graduate from high school and does not have a GED (husband, 14). He testified that he had never been appointed as patient's power of attorney (husband, 17). He did not remember seeing any of the admission documents, including agreement, before his deposition on May 21, 2014 (husband, 18). He also did not recall anything the administrator, Lynette Seiler Wirth, had told him during the admission process. He simply "took her word" about what he was supposed to sign (husband, 48).

Lynette Seiler Wirth is ManorCare's nursing home administrator. She fills in for the admissions coordinator when she is absent. She did the paperwork on patient's admission to ManorCare. Patient declined to sign the paperwork for her admission because she was too tired. Husband was able to execute the paperwork two days after patient's admission (Wirth, 20). Ms. Wirth testified that husband had been very alert and had asked several questions while signing patient's admission documents. She had not known at the time that husband had a power of attorney for patient (Wirth, 23). Husband had told her that he did not have a power of attorney for his wife (Wirth, 24).

Ms. Wirth believed that husband had the right to sign the paperwork because he was patient's spouse (Wirth, 25). She does not review the agreement with the patients or their representatives. She puts the agreement in front of the people, excuses herself, and makes copies of the patients' insurance cards; during her absence the people can read the agreement (Wirth, 27). Patients are not allowed to negotiate the terms of the agreement (Wirth, 35).

Based on this evidence, this court overruled the preliminary objection to enforce the agreement and sustained the remaining preliminary objections without prejudice. Defendants filed a timely appeal.

## ISSUES

Defendants raise the following issues in their concise statement of errors complained of on appeal.

1. This court erred in overruling defendants' preliminary objection seeking to enforce the agreement signed by husband on patient's behalf.

2. By overruling the preliminary objection seeking to enforce the agreement, this court erred by failing to apply the liberal policies favoring arbitration and the presumption that nursing home disputes can be arbitrated.

3. This court erred by not finding that husband had actual authority to bind patient to the agreement that he signed on patient's behalf.

4. This court erred by not finding that husband was

competent to sign the agreement on patient's behalf.

5. This court erred in not finding that the parties entered into a binding arbitration agreement under state and federal law.

6. This court erred in not finding that the agreement was not unconscionable.

7. This court erred in failing to find that there was a knowing and voluntary waiver of the right to a trial by jury and in failing to find that the terms of the agreement were direct and understandable.

8. This court erred in not severing the claims of the ManorCare defendants from the other defendants in this lawsuit and failing to order that any claims against these defendants must be adjudicated in arbitration as set forth in the agreement.

9. In overruling the preliminary objection seeking to enforce the agreement, this court erred in failing to recognize the joint state and federal policy in favor of arbitration, as well as the doctrine of Federal Preemption.

10. This court erred in not following the Pennsylvania Superior Court decision in *MacPherson v. Magee Hospital for Convalescence d/b/a Magee Rehabilitation, et al.*, 80 EDA 2013, — A.3d — 2014, *vacated, rehearing granted*, September 2, 2014, which was binding precedent when this court issued its September 2, 2014 order overruling the preliminary objection seeking to enforce the agreement.

## DISCUSSION

All of defendants' issues concern this court's refusal to enforce the agreement. These issues are without merit. This court shall first address the issues concerning husband's authority and competence to sign the agreement.

Patient removed husband as her power of attorney because he was forgetful and unstable and appointed plaintiff as her power of attorney less than three months after husband had signed the agreement. Husband signed the agreement as a spouse because he did not even realize that he was patient's power of attorney. One cannot act as the power of attorney for someone else if he or she does not know about the power of attorney. Husband is confused and does not even know his own address; he is probably incompetent to handle his own affairs, certainly someone else's business. Clearly he had no understanding about what he had signed and had just agreed to sign whatever document had been placed before him. He did not make a *knowing* waiver of the right to a jury trial and was unable to understand the consequences of the arbitration process and the rights which he gave up.

Furthermore, there is a difference between being alert and being competent. Husband was alert when he gave his deposition, but he was confused. There is no evidence about the type of questions which he allegedly asked Ms. Wirth. They could have been generic questions, such as "Where do I sign?" or "What is the date?" These types of questions are not evidence that husband was competent enough to understand the agreement.

Defendants maintain that the agreement is not

unconscionable. This contention is meritless. This court found that it was unconscionable for the following reasons.

An "adhesion contract" is a standard form contract prepared by one party, to be signed by the party in a weaker position, usually a consumer, who has little choice about the terms. In the case *sub judice*, Ms. Wirth testified that patients are not permitted to make changes to the agreement. A contract or term is unconscionable and therefore avoidable, where there is a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it. *Bayne v. Smith*, 965 A.2d 265 (Pa. Super. 2009). Therefore, agreement in the case *sub judice* is an adhesion contract, a take-it-or leave-it contract that defendants require every resident to sign upon the resident's admission.

The agreement consists of fourteen sections. No section explains to the patient or the representative what arbitration is; thus, the resident cannot have a succinct understanding of what he or she is agreeing to and what is being given up in exchange for selecting arbitration.

1. Agreement to Arbitrate "Disputes": All claims arising out of or relating to this agreement or any and all past or future admissions of the patient at this center, or any sister center operated by any subsidiary of HCR ManorCare, Inc. ("sister center"), including claims for malpractice, shall be submitted to arbitration. Nothing in this agreement prevents the Patient from filing a complaint with the center or appropriate governmental agency or from seeking review under any applicable

law of any decision to involuntarily discharge or transfer the patient.

This paragraph compels the parties in *all* claims, including those for malpractice, to enter into arbitration. Moreover, it binds the parties to arbitration even if they become patients at any time, regardless of the circumstances, at other centers that are operated by any subsidiary of HCR ManorCare, Inc.

It is one thing for realistically anticipated legal issues to arise between parties in a business transaction that both sides equally want to be mediated or arbitrated. This is a cost effective resolution of expected litigation; but it is entirely different to have an uneducated consumer enter into a contract for nursing services and find, when it is too late, that there can arise totally unanticipated issues, such as medical malpractice, as in the instant matter.

8. Right to Change Your Mind: This agreement may be cancelled by written notice sent by certified mail to the center's administrator within 30 calendar days of the patient's date of admission. If alleged acts underlying the dispute occur before the cancellation date, this agreement shall be binding with respect to those alleged acts. If not cancelled, this agreement shall be binding on the patient for this and all of the patient's subsequent admissions to the Center or any Sister Center without any need for further renewal.

This wording is not always true despite the fact that it misleads the consumer to believe he can change his

mind anytime within the first 30 days. For instance, even when a patient's claim arises on the first day at the home, regardless of having the agreement cancelled on the second day, which is well within the 30 days, the patient is still forced to arbitrate the claim and is barred from going to court. That is because the second sentence allows the cancellation for *only those claims* that arise after the cancellation date. In essence, the wording *right to change your mind* in this instance is not true even if the agreement is cancelled within thirty days of signing. Thus, whenever the agreement is cancelled by sending notice on the 30th day, any claims that arose in the first twenty-nine days still must be arbitrated even though the paragraph misinforms the patient otherwise.

On the other hand, if the agreement is not cancelled, this paragraph again confirms the binding of the patient not only to his or her current admission to this nursing home, but also to any future admissions to any facility owned by defendants, even without the execution of a new agreement.

11. Confidentiality: The arbitration proceedings shall remain confidential in all respects, including all filings, deposition transcripts, discovery documents, or other materials exchanged between the parties and the panels' award. In addition, following receipt of the panels' award, each party agrees to return to the producing party within 30 days the original and all copies of documents exchanged in discovery and at the arbitration Hearing.

This paragraph further protects defendants from having the public learn the truth as to what happened. Patients may suffer grievous injuries and/or death, but the defendants remain unscathed with the use of arbitration except for paying a portion of the damages. Arbitrations are private between the parties, unlike lawsuits which are open to the public; therefore, arbitrations will not generate bad publicity for defendants. Some injuries alleged are so egregious that if they are proven, they should be made known publicly; a lack of transparency in critical issues may be against public policy because the consumer has the right to be informed.

This provision further requires that all evidence, *including all* copies that could be used to plead or argue the truth of the actual liability/damages shall be returned to defendant. This continuing secrecy guarantee is very disturbing in any legal proceeding, especially when it is designed to bury all proof of bad things that may be alleged to occur in a nursing home that solicits and contracts with patients from the general public.

14. Health Care Decision: The parties hereby stipulate that the decision to have the patient move into this Center and the decision to agree to this agreement are each a health care decision. The parties stipulate that there are other health care facilities in this community currently available to meet the patient's needs.

In this paragraph, defendants try to claim that a decision to sign the agreement is a health care decision. This is a ridiculous attempt to try to avoid having the agreement

scrutinize by the courts by claiming that it is a health care decision. A decision to arbitrate is not a treatment decision and does not impact in any way on one's health, unless defendants inform the patient that he or she will treated better if the agreement is signed. Moreover, how does the consumer know if there are other facilities in the community that could meet the patient's needs and have an opening? Patients are not able to gain admission to a facility if there are no available beds. This paragraph, in effect, punishes the patient for selecting defendants for his or her healthcare needs.

## Conclusion

Husband is not a sophisticated businessman or a health services worker. He is eighty-seven years old and has memory problems. Husband did not even read the agreement. No evidence was produced that showed husband had the acumen to negotiate with defendants on an equal footing even if he had read and understood the agreement.

Additionally, there is no evidence that either patient or husband remotely expected that defendants' employees would harm patient. It is logical to conclude that patient and her relatives involved in the signing process were thinking of only contractual issues concerning her stay at the home when arbitration issues were visualized — not nursing home and/or medical malpractice issues. A negligence action was not foreseeable by patient or her family; if it had been, patient might not have chosen to reside there.

Arbitration may be fine for monetary issues in business transactions, but injuries caused negligently in tort should not be the subject of routine arbitration unless both parties fully and completely negotiated and agreed to the final terms. Unlike contracts where the breaches are anticipated because they are negotiated, and, therefore, the issues are relatively clear, and a breach can be easily identified, negligence issues are not at all obvious, and unless the defendants warn the patients of possible malpractice, not at all anticipated.

For all of the above reasons, this court found that the agreement in the instant case is unconscionable and voidable. Neither patient nor husband was competent on the day of her admission. Patient was in so much pain that defendants agreed with her that she was unable to sign admission documents. Defendants rushed to conclude the paperwork by having her husband sign even though he was not competent to even realize he was patient's power of attorney.

The agreement is procedurally unconscionable because it was presented to husband who basically signed the paperwork, including the agreement, without full knowledge of its binding terms and conditions. It was not patient who executed the agreement; husband simply signed as a formality because he was told that he could do so as a spouse.

There was also a great disparity in the bargaining positions between the parties. Even if husband could understand what he was doing — that he was doing it

because he had a power of attorney, and what the entire agreement said and meant, he still could not negotiate this agreement in any way. He had to take the agreement as is.

The agreement is substantively unconscionable because it violates public policy. In the case *sub judice*, patient's voluntary waiver of a right to a jury trial is not a knowing waiver. Neither she nor husband understood what they might be waiving — she, because of the pain and he because of his incompetency. There is no evidence that this patient even knew that husband waived a jury trial or even a court proceeding. Neither patient nor husband is an attorney or a businessperson experienced in the law. This court cannot conclude that either patient or husband understood their rights. Therefore, this court concluded that husband lacked informed consent when he agreed to waive the resolution of all future disputes in a court of law in favor of private arbitration, *even if he had legal authority to bind his wife*.

Defendants further maintain that this court erred in not severing these defendants' claims against the other defendants' claims in the case *sub judice* and failing to order that the claims against these defendants must be adjudicated in arbitration. This claim is without merit. No defendant requested severability. Moreover, this court found the agreement invalid for the many aforesaid reasons. Severing defendants' claims would not have affected this court's decision.

Defendants' last assertion is that this court erred in not following the Superior Court's decision in *MacPherson*

which was binding precedent when this court issued its decision in this case. The facts in the case *sub judice* were inapposite to those in *MacPherson*. This court found that husband, unlike the plaintiff in *MacPherson*, was not competent to enter into a binding arbitration agreement even if he had known he was patient's power of attorney. Neither he nor his patient/wife made a knowing waiver of the constitutional rights that are guaranteed to every citizen.

In accordance with the foregoing opinion, this court submits that its order should be affirmed and defendants' appeal denied.